STONE FOREST INDUSTRIES,
INC., Plaintiff,

v.

UNITED STATES of America,
Defendant.

No. 765–86 C.

United States Claims Court.

Feb. 4, 1991.

Wesley R. Higbie, San Francisco, Cal., for plaintiff.

Paul D. Langer with whom were Asst. Atty. Gen. Stuart M. Gerson, David M. Cohen, Thomas W. Petersen and Carolyn E. Galbreath, Washington D.C., for defen-

dant. Kenneth Capps, Dept. of Agriculture, of counsel.

## OPINION AND ORDER

TURNER, Judge.

This case involves a timber sale contract (the Flathead Helicopter Salvage Timber Sale Contract) between the Department of Agriculture, Forest Service, and Stone Forest Industries, Inc. (SFI)[1] dated October 25, 1977. The complaint alleges that the government breached the Flathead contract and seeks a refund of advance deposits paid for the right to harvest timber under the contract.[2]

SFI duly filed a claim with the contracting officer on June 17, 1986 seeking a refund of advance deposits of $468,531.81. The claim was denied on August 18, 1986, and SFI filed the complaint in this action on December 9, 1986. A subsequent contracting officer's decision on January 26, 1987 assessed damages against SFI in the amount of $356,763.36 for its failure to cut timber included in the contract. Refunds totalling $111,768.45 were made to SFI which represented the portion of advance deposits attributable to timber volume encompassed within wilderness area boundaries after the contract was awarded. On April 27, 1987, SFI filed an amended complaint reducing its claim to $356,763.36 in order to reflect the partial refund of advance deposits. SFI now seeks a refund of the remaining deposits in addition to interest on the amounts already refunded from the date SFI's claim was received by the contracting officer until the date each payment was made. SFI also seeks interest on the interest due with the partial refunds but which has never been paid by the Forest Service.

The parties have filed cross motions for summary judgment pursuant to RUSCC 56. Oral argument on the cross motions was held on December 11, 1990. We conclude that SFI is entitled to recover on its claim for interest due on the refunds previously received but is not entitled to recover on its claim for refund of the remaining advance deposits. Accordingly, each party's motion for summary judgment should be granted in part and denied in part.

## I

Plaintiff is engaged in the forest products business. On October 25, 1977, the Forest Service awarded to plaintiff the Flathead Helicopter Salvage Timber Sale Contract. By the terms of the contract, SFI agreed to purchase, cut and remove timber on fourteen units of Forest Service land located in the Klamath National Forest in California.

The original contract termination date was March 31, 1980. At plaintiff's request, this date was extended to March 30, 1983, in order to allow SFI to log other timber that was more urgently in need of harvesting. On March 1, 1983 a conditional extension was granted to give SFI time to review a proposed modification, and on May 12, 1983 the modification was executed extending the contract termination date to March 31, 1985. The May 12, 1983 modification also adjusted the contract to require SFI to make cash deposits prior to harvesting timber to cover its estimated value and provided for a redetermination of contract rates.

SFI paid advance deposits due under the contract in 1984 when it was billed for them by the Forest Service. During the 1984 operating season, the Forest Service granted SFI a contract term adjustment for time lost due to a road closure and extended the termination date of the contract to September 3, 1985. It also deferred further payment by SFI of 1984 advance deposits until the 1985 operating season. In

---

1. Stone Forest Industries, Inc. is the successor-in-interest to Stone Container Corporation, Southwest Forest Industries and SWF Plywood Company. The term, "SFI", shall refer to all of these entities in connection with the subject contract and the related claim.

2. Plaintiff filed its complaint pursuant to the Tucker Act, 28 U.S.C. § 1491 and the Contract Disputes Act of 1978, 41 U.S.C. §§ 601–613. SFI met the jurisdictional requirements of the Claims Court by certifying its claim in accordance with the CDA, 41 U.S.C. § 605(c)(1). *See* Pl.App. 46.

October 1984, the Forest Service statement of account for the month of September 1984 showed that SFI had a credit balance of $468,531.81.

On September 28, 1984, the California Wilderness Act, Pub.L. No. 98–425, 98 Stat. 1619, became law. The Act designated several new wilderness areas, one of which was the Trinity Alps Wilderness in the Klamath National Forest. By letter of December 6, 1984, the Forest Service notified SFI of possible impacts that the newly-established Trinity Alps Wilderness area might have on the Flathead timber sale (Pl.App. 10).[3] The letter indicated that portions of two units, 8 and 9, as well as a portion of a road (# 39N34) which accessed units 11 and 14, were included within the new wilderness boundary.

On December 21, 1984, Edgar A. Kupillas, SFI Division Timber Manager, wrote to the Forest Service requesting that units 8, 9, 11, and 14 be deleted from the sale (Def.App. 4). On January 17, 1985, Kupillas again wrote to the Forest Service, this time requesting that the Flathead sale be cancelled in its entirety because of the effect of the wilderness legislation and because of problems inherent in the original sale (Def.App. 6–7). The Forest Service responded on February 1, 1985, that it did not have sufficient information to give SFI an answer to the request to terminate the sale but that it hoped to have an answer by March 1, 1985 (Pl.App. 14).

In an internal memorandum dated April 2, 1985, Kupillas evaluated the effects of logging the Flathead sale. He listed the subject of the memorandum as "To log or not to log the Flathead Helicopter Sale?" (Def.App. 40). Kupillas made the following three estimations: (1) if the Forest Service determined that the wilderness boundaries were a mistake and that SFI was required to complete the entire sale including units 8, 9, 11, and 14, then SFI would lose approximately $928,000; (2) if the Forest Service determined that only unit 9 was in the wilderness area and excluded it from the sale, SFI would lose $790,000 if it was required to complete the sale; (3) if the Forest Service determined that all of the wilderness boundaries were good, and deleted units 8, 9, 11, and 14 from the sale, SFI would lose only $607,000 if it completed the remaining logging on the sale. He then concluded, "It looks to me like we can't lose by simply not doing any more logging on the sale and I so recommend" (Def.App. 40–43).

On April 24, 1985, Stanley A. Vail, SFI's Northern California Logging Manager, wrote to Forest Service representative Hippler that SFI planned to start operations on the Flathead Timber Sale beginning May 1, 1985. The letter stated that SFI planned to begin logging in Units 11 and 14 and that all logging would be completed by the contract termination date of September 3, 1985 (Def.App. 53). Hippler responded to SFI's plan of operation on April 30, 1985 with a letter to the attention of Kupillas. Hippler's letter temporarily denied SFI access to units 11 and 14 because the question of adjusting the new wilderness boundaries had not been resolved. It further stated that additional deposits would become due when, and if, the wilderness boundary issue was resolved in SFI's favor or SFI chose to operate in a portion of the sale not affected by the legislation (Pl.App. 15a). At the beginning of the 1985 operating season, several units remained to be logged on the Flathead sale other than those units affected by the CWA.

By July 10, 1985, the Forest Service had resolved its uncertainties concerning the wilderness boundary issues associated with passage of the CWA. It was decided that access road # 39N34 would be deemed excluded from the Trinity Alps Wilderness Area so that units 11 and 14 would no

---

**3.** The following abbreviations will be used throughout this opinion:

"Pl.App." refers to the separately-bound Appendix to plaintiff's cross-motion for summary judgment filed September 19, 1989.

"Def.App." refers to the separately-bound Appendix to defendant's motion for summary judgment filed May 10, 1989.

"Def.Rep.App." refers to the Appendix attached to defendant's reply brief filed November 16, 1989 and its motion for leave to file appendix pages filed November 21, 1989.

longer be affected by the wilderness boundaries, but it was also determined that portions of units 8 and 9 would remain within the wilderness area. The Forest Service indicated that it planned to resolve the boundary problem by adjusting the Flathead sale through an "environmental modification" process which would have the effect of deleting from the sale the affected portions of units 8 and 9 (Def.App. 57, 58).

During a telephone conversation in mid-July 1985, Forest Service representative Jerome Hippler orally informed Kupillas that SFI could begin logging in units 11 and 14 in accordance with its operating plan but that portions of units 8 and 9 would be deleted from the sale. (This action was tantamount to refusing SFI access to log in units 8 and 9 and, in effect, granted in part plaintiff's earlier request to delete units 8 and 9 from the sale.) In a deposition, Kupillas stated that in light of the fact that he had an outstanding request to cancel the Flathead sale, he was not going to start logging operations until he had written verification from the Forest Service that the wilderness boundaries had been changed. He further stated that he asked Hippler to give him the authorization to begin logging in writing [4] with documentation that the boundaries had been changed (Pl.App. 79, 80). Hippler, in a deposition, stated that he could not recall whether Kupillas had asked for written authorization to begin logging in units 11 and 14 but explained that he didn't think that Kupillas had because it would have been a very simple matter to put it in writing (Def.App. 88). Although this fact is clearly in dispute, we conclude that it is not material to a ruling on the cross-motions for summary judgment. SFI does not deny having received oral notification that it could proceed with logging operations; the parties agree that

in mid-July, Hippler orally notified SFI that it could commence logging in units 11 and 14.

SFI did not log any portion of the Flathead timber sale during the 1985 operating season and the contract expired by its own terms on September 3, 1985. By letter dated October 3, 1985, Hippler notified SFI that the contract had terminated with "Purchaser failing to cut designated timber on portions of the sale area" (Def.App. 9). This letter also informed SFI that the Forest Service intended to appraise the remaining timber and offer it for resale in accordance with the contract.

By letter dated June 17, 1986, SFI made a certified claim to the contracting officer for refund of all advance deposits previously paid in the amount of $468,531.81 as well as for interest on the amount of the claim under the Contract Disputes Act. (By operation of law, 41 U.S.C. § 611, a CDA claim includes a claim for interest on the principal amount thereof from the date received by the contracting officer.) The contracting officer issued a final decision dated August 18, 1986 in which he temporarily denied the claim in its entirety but indicated (by reference to prior correspondence) that SFI would receive a refund of any deposits in excess of damages thereafter found to be due to the government. The Forest Service unsuccessfully offered the remaining timber for resale in December 1986 and then determined damages resulting from SFI's failure to complete required timber cutting pursuant to a contract provision.

A subsequent final decision dated January 26, 1987 was issued by the contracting officer setting forth a damage claim against SFI in the amount of $356,763.36 for failure to cut, remove, and pay for timber included in the sale.[5] In accordance

---

4.  Standard Provision B6.11 of the contract required that notices by either party be in writing: "Notices by either party as to action taken or to be taken by the other respecting this contract shall be made in writing to the other party's designated representative."

5.  The contract contained the following provision which contemplated failure by the purchas-

er to complete the contract by its termination date:

*B9.5—Settlement.*

If obligations of Purchaser have not been fully discharged by Termination Date, any money advanced or deposited hereunder shall be retained to be applied toward unfulfilled obligations of Purchaser without prejudice to

with this decision, SFI received three partial refunds of advance deposits from the Forest Service in the total amount of $111,-768.45 which constituted the deposits for timber on portions of units 8 and 9 included within the CWA wilderness boundary. SFI amended its complaint in this action to reflect the refunds and adjusted the amount claimed to $356,763.36 plus interest.

The government concedes liability for interest under 41 U.S.C. § 611 on the amounts refunded but contests liability for interest on the interest not paid with the principal. Government counsel acknowledged at oral argument that the refunds were partial payment of the amount demanded in SFI's certified claim pursuant to the Contract Disputes Act, 41 U.S.C. § 605. Transcript of 12/11/90 hearing, pp. 23–27.[6]

## II

■ SFI's claim for refund of the advance deposits arises from the passage of the California Wilderness Act, Pub.L. No. 98–425, 98 Stat. 1619, on September 28, 1984, and the Forest Service's actions based on the legislation. The CWA designated several new wilderness areas which became components of the National Wilderness Preservation System. Recognizing that passage of the Act would interfere with existing contract rights, Congress included section 103 in the Act which states:

(a) *Subject to valid existing rights,* each wilderness area designated by this title shall be administered ... in accordance with the provisions of the Wilderness Act [16 U.S.C. §§ 1131–1136]....

(b) Within the National Forest wilderness areas designated by this title—

....

(3) as provided in section 4(b) of the Wilderness Act, the Secretary concerned shall administer such areas so as to preserve their wilderness character and to devote them to the public purposes of recreational, scenic, scientific, educational, conservation, and historical use.

(Emphasis added.)

Although the CWA does not contain an explicit prohibition on logging activities within the new wilderness areas, the Wilderness Act contains the following section which addresses prohibited activities:

Except as specifically provided for in this chapter, and subject to existing private rights, there shall be no commercial enterprise and no permanent road within any wilderness area designated by this chapter and, except as necessary to meet minimum requirements for the administration of the area for the purpose of this chapter ..., there shall be no temporary road, no use of motor vehicles, motorized equipment or motorboats, no landing of aircraft, no other form of mechanical transport, and no structure or installation within any such area.

16 U.S.C. § 1133(c).

The Forest Service interpreted the CWA to mean that logging operations were prohibited in the Trinity Alps Wilderness Area despite the existence of the phrase "subject to valid existing rights" in the statute. Accordingly, the Forest Service notified SFI that the legislation would impact the Flathead timber sale (DX 1). In response, SFI first requested that the affected units be deleted from the sale and later requested that the entire sale be cancelled (DX 4, 6). Having received no definitive response to

---

any other rights or remedies of Forest Service.

6. Government counsel stated:

[O]nce we determined those damages we refunded the excess to Stone Forest Industries and Stone Forest Industries had made a valid point under the Contract Disputes Act for the difference....

So by the time that we gave them the refund we admit that they were entitled to those funds. We held those funds when they were their funds and we would not contest the interest on those funds.... So the Govern-

ment would not challenge the interest on that money.

We did in fact hold their money during a period when they had made a valid claim under the Contract Disputes Act. We refunded that money. ... We wanted to hold onto it until we knew what our damages were.

....

... Defendant acknowledges it is liable for the CDA-type interest on the amounts refunded from the date the claims were received until the amounts were paid.

Transcript of 12/11/90 hearing, pp. 23–24, 27.

these requests, SFI filed an operating plan stating its intention to begin logging in units 11 and 14. The Forest Service temporarily denied SFI access to these units until the wilderness boundary issue was resolved. (Although no operating plan with respect to units 8 and 9 was ever submitted, the Forest Service indicated at oral argument that it would have also denied access to portions of units 8 and 9 because they were included in the new wilderness area.)

SFI asserts that the Forest Service breached the contract by its temporary denial of access to units 11 and 14 and by its failure to either modify or cancel the contract before the contract expired. SFI contends that it was prevented from logging the sale because it never received written authorization to proceed in units 11 and 14 after its plan of operations was temporarily denied. This constituted a breach, according to SFI, because the CWA specifically protected the valid existing rights of timber contractors. SFI further contends that this alleged breach with respect to units affected by the CWA excused any further performance of the contract by SFI. (SFI does not seek traditional breach of contract damages,[7] but rather seeks only a refund of the advance deposits paid.)

Defendant argues that although the CWA preserved "valid existing rights" of contractors, it did not guarantee contractors the right to log in newly designated wilderness areas. Defendant interprets the "valid existing rights" language to mean that in the event the Forest Service prohibits access to a prior sale area based on passage of legislation, there must be appropriate accommodation to compensate those holding valid existing rights. In this case, such accommodation was made, according to the Forest Service, because it refunded to SFI those portions of the advance deposits pertaining to affected portions of units 8 and 9.

Cases interpreting the statutory phrase "subject to valid existing rights" include *Burlington N.R. Co. v. United States,* 752

F.2d 627 (Fed.Cir.1985) (Surface Mining Control and Reclamation Act); *Skaw v. United States,* 740 F.2d 932 (Fed.Cir.1984) (Wild and Scenic Rivers Act of 1968); and *Freese v. United States,* 639 F.2d 754, 226 Ct.Cl. 252, *cert. denied,* 454 U.S. 827, 102 S.Ct. 119, 70 L.Ed.2d 103 (1981) (Sawtooth National Recreation Area Act). Plaintiffs in those cases generally sought compensation for alleged fifth amendment takings. In *Burlington N.R. Co.,* the government argued that if Burlington could bring itself within the "subject to valid existing rights" exception to the prohibition on surface coal mining, then the government would most likely grant a permit to conduct surface coal mining on land within the Custer National Forest. The Federal Circuit affirmed the Claims Court's dismissal of the case as premature since the railroad company had not exhausted its administrative remedies by requesting a mining permit. *Hedstrom Lumber Co. v. United States,* 7 Cl.Ct. 16 (1984), involved the termination of pre-existing timber contracts by the Boundary Waters Canoe Area Wilderness Act. That Act did not contain the "subject to valid existing rights" language but instead provided just compensation for contracts terminated or modified by the Act. In the present case, SFI's timber contract was never terminated or modified before it expired by its own terms.

We must decide whether the Forest Service's denial of access to timber included within the contract was a breach when SFI's preexisting contract rights were specifically protected by the Act. If so, we must decide whether any such breach would excuse SFI from performance of the remainder of the contract not affected by the CWA.

■ We interpret section 103(a) of the California Wilderness Act as preserving SFI's contract rights in their entirety. In our view, the plain meaning of the phrase "subject to valid existing rights" is that all existing rights, including contract rights, were left untouched by the wilderness legislation. Accordingly, SFI had the right to

---

7. Presumably because it could prove none. SFI apparently avoided hundreds of thousands of

dollars of loss by defaulting on its obligations to remove timber (Def.App. 40–43).

conduct logging operations in all areas covered by the terms of its timber contract. *See Burlington N.R. Co. v. United States,* 752 F.2d 627 (Fed.Cir.1985); *Freese v. United States,* 639 F.2d 754, 226 Ct.Cl. 252, *cert. denied,* 454 U.S. 827, 102 S.Ct. 119, 70 L.Ed.2d 103 (1981). Denial of access to these areas by the Forest Service based on wilderness legislation containing the "subject to valid existing rights" language would, in appropriate circumstances, constitute a breach of the contract. The facts of this case, however, do not amount to a material breach by the Forest Service which would entitle SFI to a refund of all its deposits.[8]

The Forest Service temporarily denied SFI access to log in units 11 and 14 by letter dated April 30, 1985. In mid-July, the Forest Service informed SFI by telephone that the wilderness boundary issue had been resolved and that they could proceed with logging in units 11 and 14. Since the denial of access was temporary (two and one half months) pending resolution of the boundary issue and SFI's rights under the contract were not altered, we conclude that the Forest Service's action with respect to units 11 and 14 did not breach the contract. If the denial had been permanent, then there would have been a breach of the contract because SFI's contract rights were protected by the statutory provision, "subject to valid existing rights." Our conclusion is reinforced by the fact that SFI failed to request a contract term extension which would have compensated for the delay caused by the wilderness boundary problem.

Since there was no breach of the contract by the Forest Service with respect to units 11 and 14, SFI's performance of the remainder of the contract was not excused. Because SFI failed to discharge its obligations before the termination date of the contract, SFI is not entitled to a refund of the remaining deposits. Contract provision B9.5—Settlement, states: "If obligations of Purchaser have not been fully discharged by Termination Date, any money advanced or deposited hereunder shall be retained to be applied toward unfulfilled obligations of Purchaser without prejudice to any other rights or remedies of Forest Service."

The Forest Service denied SFI access only to units 11 and 14, not to units 8 and 9. If SFI had submitted an operating plan pertaining to units 8 and 9, a permanent denial of access to portions of those units would have breached the contract in part. Although counsel for the Forest Service indicated at oral argument that such access probably would have been denied, nothing in the record shows that SFI ever sought access to log in units 8 and 9. Plaintiff's breach claim is not based on a denial of access to units 8 and 9. *See* note 8, *supra.*

SFI's contract terminated by its own terms on September 3, 1985 before it was either formally modified or cancelled. After the contract terminated, SFI requested a refund of advance deposits paid. The Forest Service refunded the portion of the advance deposits attributable to portions of units 8 and 9 affected by the CWA but retained the remainder as damages as permitted under the contract (provision B9.4—Failure to cut). We conclude that SFI was entitled to a refund of all deposits made

**8.** By deleting portions of units 8 and 9 from the contract and indicating to SFI that it would no longer be able to log timber in those areas, the Forest Service expressed a positive and definite intent to refuse SFI access to timber included in its contract. Presumably, this constituted a *pro tanto* anticipatory breach of the contract which would, at the least, entitle SFI to a refund of advance deposits related to timber on the affected portions of units 8 and 9. *See generally United States v. Dekonty Corp.,* 922 F.2d 826 (Fed.Cir.1991) (a positive, definite, unconditional and unequivocal refusal to perform future contract obligations may be treated as an immediate breach). The parties did not specifically address this precise issue; the focus of plaintiff's summary judgment efforts was on government conduct concerning access to units 11 and 14. However, we need not resolve whether Forest Service pronouncements about units 8 and 9 constituted a partial breach since (1) in no event would it constitute a material breach of the entire contract which would excuse all performance by SFI and (2) defendant concedes that SFI was entitled to refund of deposits related to affected portions of units 8 and 9, together with interest thereon under 41 U.S.C. § 611, the only relief sought by plaintiff with respect to the "wilderness" parts of units 8 and 9.

with respect to timber volume on those portions of units 8 and 9 within the CWA wilderness boundaries; the parties now agree that all deposits pertaining to those portions of units 8 and 9 have been refunded to SFI. Plaintiff's current deposit refund claim is for deposits made on units 11 and 14 and other unlogged portions of the sale.

■ SFI also argues that the Forest Service's failure to either modify or cancel the contract before its termination date was a breach of the covenant of good faith and fair dealing. SFI cites no legal authority for the proposition that modifications or terminations of timber sale contracts have to occur within a specified time period. The record indicates that the Forest Service proceeded to resolve the discrepancies between the new wilderness boundaries and the affected timber contracts in a reasonable and orderly fashion. Nothing in the record supports a finding that the Forest Service acted in bad faith. *See* Restatement (Second) of Contracts § 205, comment d (1979) (bad faith includes evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance).

### III

■ Historically, the United States has been immune from liability for interest awards in the absence of express Congressional consent to the award of interest which is separate from a general waiver of sovereign immunity. *See Library of Congress v. Shaw,* 478 U.S. 310, 106 S.Ct. 2957, 92 L.Ed.2d 250 (1986). The Contract Disputes Act contains such express congressional consent in 41 U.S.C. § 611 which states:

> Interest on amounts found due contractors on claims shall be paid to the contractor from the date the contracting officer receives the claim ... from the contractor until payment thereof. The interest provided for in this section shall

be paid at the rate established [by separate law].

This section provides for the payment of interest on successful claims brought by government contractors. SFI was partially successful on its claim to the contracting officer for refund of advance deposits, and defendant concedes SFI's entitlement to interest on the refunded deposits. Its total claim was for $468,531.81 of which it received $111,768.45 in various installments. SFI is entitled to receive interest on the successful portion of its claim under 41 U.S.C. § 611 from the date the contracting officer received the claim (presumably, shortly after the claim was made on June 17, 1986) until payment of it. The Forest Service made three payments refunding advance deposits to SFI ($51,981.45 on December 25, 1986; $10,650.00 on December 31, 1986, and $49,137.00 on February 17, 1987). Interest shall be calculated on these respective amounts from the date the contracting officer received the claim until the date each payment was made to SFI.

■ SFI also seeks additional interest on the amounts of interest due since the government still has not paid the interest even though it concedes liability for it. We interpret § 611 to mean that interest is payable at the time the principal amount is paid to a contractor on a successful claim. Each time the Forest Service made a payment of principal to SFI it was obliged to also pay the interest due at that time. Since the Forest Service failed to make the interest payments required by statute when it made payments of principal, we conclude that SFI is entitled to additional interest on the original interest which was due at the time the claims were paid. *See ReCon Paving, Inc. v. United States,* 745 F.2d 34 (Fed.Cir.1984) (interest provision is remedial in nature and was designed to serve as a monetary incentive to the contracting officer to expedite consideration of requests for payment by contractors). To hold otherwise would permit the government to have the benefit of withheld sums due as interest whenever it chose to delay such payment. The government would then have financial incentive to delay payments of interest lawfully due until a con-

tractor brought suit and obtained a judgment for the interest.

IV

Defendant's motion for summary judgment filed on May 10, 1989 is GRANTED with respect to plaintiff's amended claim for unrefunded advance timber deposits and is otherwise DENIED. Plaintiff's cross-motion for summary judgment filed on September 19, 1989 is GRANTED to the extent of interest on refunded deposits and is otherwise DENIED. The parties are requested to confer concerning the precise amounts due to plaintiff as interest on the refunded deposits and as further interest on the withheld interest payments and to file a stipulation of damages not later than Monday, March 4, 1991. If the parties are unable to so stipulate, a joint status report shall be filed not later than March 4, 1991 pertaining to the remaining issues to be resolved by the court.